FILED $_{LAL}$

AUG 2 9 2005

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

KANYE WEST, )
                                  Plaintiff, )
                                        )
             vs. )
                                          )
ERIC "E-SMOOVE" MILLER )
and FOCUS MUSIC GROUP, INC. )
                                        )
             Defendants. )

05C 4977

JUDGE ANDERSEN

MAGISTRATE JUDGE VALDEZ

FILED

AUGUST 29, 2005
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## COMPLAINT

Plaintiff Kanye West ("West"), by his attorneys, Ronald H. Balson and Carrie A. Hall of the law firm Hill, Gilstrap & Balson, P.C., as and for his complaint against defendants Eric "E Smoove" Miller and Focus Music Group, Inc., alleges as follows:

### NATURE OF THE ACTION

1.     In this action, West seeks compensatory and punitive damages and declaratory and injunctive relief based upon defendants' unauthorized and unlawful exploitation of certain master recordings made in early 1995 embodying the performances of West. By their actions, defendants have committed acts of commercial misappropriation and commercial unfair competition and have violated: (a) §1075/30 of the Illinois Right of Publicity Act; (b) §43(a) of the Lanham Trademark Act; and (c) §510/2 of the Illinois Uniform Deceptive Trade Practices Act.

### JURISDICTION AND VENUE

2.     This action arises under: (a) the Lanham Trademark Act, 15 U.S.C. §1125(a); (b) the Illinois Right of Publicity Act, 765 ILCS 1075/30; (c) the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2; (d) the common law of the State of Illinois; and (e) the Declaratory Judgment Act, 28 U.S.C. §2201 et seq.

3.     Jurisdiction is conferred upon this Court pursuant to 15 U.S.C. §1121 and 28 U.S.C. §§ 1331, 1332, 1338 and 1367.

4.     The venue of this action is properly laid in this District pursuant to 28 U.S.C. §§ 1391(b) and (c).

### THE PARTIES

5.     Plaintiff Kanye West is a well-known recording artist and music producer and is a citizen and resident of the State of California.

6.     Upon information and belief, defendant Focus Music Group, Inc. ("Focus") is a corporation duly organized and existing under the laws of the State of Illinois with a principal place of business at 22514 Crescent Way, Richton Park, Illinois 60471-1861.

7.     Upon information and belief, defendant Eric "E Smoove" Miller ("Miller") is a citizen and resident of the State of Illinois and is the president, sole owner, sole employee and alter ego of Focus. Focus and Miller shall sometimes be collectively referred to herein as "the Miller Defendants."

### FACTS COMMON TO ALL CLAIMS FOR RELIEF

**The Success Of Kanye West**

8.     Kanye West is a well-known music producer and hip hop artist. In addition to producing hits for numerous well known artists such as Jay-Z and Alicia Keys, West is an ac-claimed songwriter and rapper.

9.     In 2004, West released his debut album, "The College Dropout," which album sold over 3 million copies worldwide and earned West ten Grammy nominations. At the 47th Annual Grammy Awards in 2005, West won Grammy awards for Best Rap Album, Best Rap Song and Best R&B song.

2

10.    West has been featured in numerous magazines and newspaper articles, including articles in *The New York Times*, *The Daily Herald*, *The Chicago Sun-Times*, *The Chicago Tribune* and *USA Today*. In addition, West has appeared on several nationally and internationally televised shows, including the recent Live 8 Concert Performance in July 2005 which was televised to over 9.6 million viewers throughout the world.

11.    West is currently signed to an exclusive recording deal with a major record label, Roc-A-Fella Records, and his much anticipated new album, "Late Registration," is scheduled for release in late August 2005.

**The Unauthorized Masters**

12.    The Miller Defendants are in possession of certain master recordings embodying the performances by West (the "Unauthorized Masters") of several songs composed by him, including, but not limited to:  (1) 25 To Life; (2) Ho!!!; (3) I Keep MC's Lookin Out; (4) My People's Get Down; (5) Real Nigga Live; (6) Stop Frontin'; (7) There Are None; (8) What Am I To You??; and (9) Are We Goin Far?

13.    The above songs were written and performed and the Unauthorized Masters were made in or about early 1995, prior to the time that West turned 18 on June 8, 1995.

14.    West did not have a contract, either written or oral, with Miller or Focus at the time that the Unauthorized Masters were made, and has never entered into any contractual relationship with either Miller or Focus.

15.    West did not grant and has never granted any rights to Miller or Focus to exploit the Unauthorized Masters in any way, shape or form.

**Miller And Focus Unlawfully Attempt To Exploit The Unauthorized Masters**

16.     Although the Miller Defendants never sought or obtained West's permission to exploit the Unauthorized Masters, the Miller Defendants proceeded to exploit the Unauthorized Masters in or about early 2005.

17.     In or about February 2005, the Miller Defendants approached John Galt Entertainment, Inc. ("Galt Entertainment") of Nashville, Tennessee, to fund a deal and become the North American distributor for ten unreleased Kayne West tracks, i.e., the Unauthorized Masters.

18.     The Miller Defendants represented to Galt Entertainment that they already had a distribution deal in place in Europe and sought a $450,000 upfront payment from Galt Entertainment for North American distribution rights.

19.     The Miller Defendants further represented to Galt Entertainment that they had a contract with West to exploit the Unauthorized Masters and presented Galt Entertainment with a document entitled "Focus Music Group – Artist Recording Agreement" which they represented was signed by West and Miller on May 19, 1995. A copy of this document is annexed hereto as Exhibit A.

20.     In fact, the document was a complete and utter fraud which had been prepared by the Miller Defendants in early 2005 solely for the purpose of convincing distributors and others that they had obtained West's permission to exploit the Unauthorized Masters.

21.     West had never signed (or even seen) the document and his signature was a forgery.

22.     The Miller Defendants subsequently admitted to West's representatives that the contract was bogus and that they had forged West's signature on it.

4

23.     On the date that the document (hereafter referred to as the "Fraudulent and Forged Agreement") was allegedly executed by West and Focus (by Miller), West was a minor, not having turned 18 yet.

24.     On February 24, 2005, Jeffrey Pringle ("Pringle") of Galt Entertainment, prior to entering into any agreement with Miller and Focus, sent an e-mail to West's counsel, Alison Finley ("Finley") of Davis, Shapiro, Lewit, Montone & Hayes LLP, asking her to verify the legitimacy of the representations made by the Miller Defendants that they had obtained West's permission to exploit the Unauthorized Masters and eventually sending her a copy of the Fraudulent and Forged Agreement. Pringle's e-mail to Finley, a copy of which is annexed hereto as Exhibit B, stated, in full:

> I could use a little help. We have been approached to fund a deal for 10 unreleased Kayne tracks. Under the agreement, I guess Kanye did these recording in 1995 with Focus Music Productions of Chicago, IL. There [sic] intentions are to have us distribute the record in North America for them, I believe they already have a deal in place for Europe. We were hoping you would be kind enough to let us know if this company's warranties in their recording agreement with Kanye are valid, and there is no other paperwork or copyright transfer for these recordings that would prohibit us from doing business with Focus. We have to pay $450,000 upfront, but feel a little uneasy about it, even though the paperwork looks just fine. I can send you copies of the agreement that I am questioning, if need be. Please give me a ring if you like and I appreciate any sort of help you can be.

25.     Upon information and belief, the Miller Defendants also approached Pickwick Group, a major record company in the United Kingdom, to distribute recordings of the Unauthorized Masters in Europe.

**The Miller Defendants Admit That The Fraudulent And Forged Agreement Is Exactly That And Seek To Obtain West's Permission To Exploit The Unauthorized Masters**

26.     Upon receiving the Fraudulent and Forged Agreement and confirming that West had not signed or ever seen the document, Finley contacted Steve Hulme ("Hulme"), who was

acting on behalf of the Miller Defendants, and told him that West's signature was a forgery and that West had not authorized the exploitation of the Unauthorized Masters in any way.

27. The Miller Defendants, clearly aware that they did not have West's permission to exploit the Unauthorized Masters, caused Hulme to send Finley an e-mail on March 17, 2005, which included a proposal by Miller to West in which Miller offered to compensate West in return for West's granting permission to Miller to exploit the Unauthorized Masters as part of a "Chicago Unreleased" project. A copy of this e-mail is annexed hereto as Exhibit C.

28. On that same day, March 17, 2005, Miller, upon learning from Hulme that Finley had seen the Fraudulent and Forged Agreement, sent an e-mail to one of West's representatives, John Monopoly ("Monopoly"), in which he admitted that West's signature had been forged and that the document was fraudulent. In his e-mail, a copy of which is annexed hereto as Exhibit D, Miller admitted:

> That contract that Allison has is a non issue, it was just a dummy up we were using to get the distributors to even talk to us. It was never supposed to leave the Broker's hands but one of the distributors must have gotten anxious while we were researching the numbers. As far as his Mom goes, she may remember when Kanye was working with me because she brought him to me at the studio in Crestwood. I recall you being around then once or twice also. Honestly, we were doing things very informally so I don't remember if we were waiting to get a deal to do the contracts or not. If it's confusing just call me I'm in the office now. 708 747 8900. (emphasis supplied).

29. Miller, aware that he could not exploit the Unauthorized Masters without first obtaining West's permission to do so, sent e-mails to Monopoly on March 21 and March 23, 2005 asking if West had a response to the proposal and would grant his consent. On March 23, 2005, Monopoly informed Miller that West would not consent to the release and distribution of the Unauthorized Masters.

6

30.     Having been rejected by West (through Monopoly) on March 23, 2005, Miller later that day contacted West's mother, Donda West ("Donda"), to ask again if West would consent to the release and distribution of the Unauthorized Masters. Donda informed Miller, as had Monopoly, that West would not so consent.

31.     Miller, acknowledging that he could not exploit the Unauthorized Masters without first obtaining West's permission to do so, sent an e-mail to Donda containing a new proposal pursuant to which Miller offered to compensate West in return for West's granting permission to Miller to exploit the Unauthorized Masters as part of the "Chicago Unreleased" project. A copy of this e-mail is annexed hereto as Exhibit E.

**The Miller Defendants Refuse To Agree To The Demands Of West's**
**Representatives That They Not Exploit The Unauthorized Masters**

32.     On March 24, 2005, Finley sent an e-mail to Miller in which she rejected Miller's proposals and demanded that the Miller Defendants immediately cease and desist from any man-ufacture, sale or distribution of the Unauthorized Masters and provide a list of all distributors they had contacted to discuss the exploitation of the Unauthorized Masters by April 14, 2005. That e-mail, a copy of which is annexed hereto as Exhibit F, stated, in relevant part:

> It has come to our client's attention that you are in possession of certain master recordings embodying the performances of Kanye West (the "Masters"). Further, it is our understanding that you and/or persons working in concert with you, are planning to exploit or have exploited the Masters.

> As you are aware, neither Mr. West nor any authorized agents or representatives of Mr. West, have granted you the right to exploit the Masters. Accordingly, you are hereby placed on notice that any exploitation by you (or persons authorized by you) of the Masters, whether commercially, promotionally or otherwise, consti-tutes an infringement of our client's rights under applicable federal and state laws, including without limitation, intentional copyright infringement, breach of our client's publicity rights, fraud, as well as, what amounts to tortious interferences with our client's actual and prospective business relationships.

In light of the foregoing, demand is hereby made that you immediately cease and desist (and advise all third-parties authorized by you), to cease and desist from any manufacture, sale or distribution of the Masters and that you destroy all such Masters (and provide us with written certification of such destruction) no later than the close of business on Monday, April 4, 2005. Additionally you must provide us with a list of all distributors with whom you have contacted to discuss the exploitation of the Masters. If you fail to comply with the foregoing, our client shall take all necessary legal actions, including but not limited to seeking injunctive and other equitable relief to prevent you or any third party from the manufacture, distribution, sale or other exploitation of the Masters.

33.     On March 29 and 30, 2005, Finley sent similar cease and desist letters to Pickwick Group and Galt Entertainment. Copies of these letters are annexed hereto as Exhibits G and H, respectively.

34.     Miller did not respond directly to Finley's March 24, 2005, e-mail and did not comply with any of the demands contained therein. Rather, he retained an attorney, Mark A. Levinsohn ("Levinsohn") of Epstein, Levinsohn, Bodine, Hurwitz & Weinstein, LLP, who contacted Finley and, like Hulme and Miller before him, sought to obtain West's permission for the Miller Defendants to exploit the Unauthorized Masters. Such permission was again denied by Finley on behalf of West.

35.     As the Miller Defendants would not agree to cease and desist from any exploitation of the Unauthorized Masters, it became necessary for West to engage litigation counsel. On June 22, 2005, Philip R. Hoffman ("Hoffman") of Pryor Cashman Sherman & Flynn, LLP wrote to Levinsohn, notifying him of the facts set forth herein, including his clients' fraudulent conduct, and demanding that the Miller Defendants confirm in writing no later than June 30, 2005, that they would not exploit the Unauthorized Masters. In his letter to Levinsohn, a copy of which is annexed hereto as Exhibit I, Hoffman also stated:

Based upon the facts set forth above and the absolutely lack of any legal basis to do so, we are somewhat shocked that your clients, through you, are still

threatening to release and distribute the Unauthorized Recordings and are demanding money from West in order to stop such release and distribution. As you have been repeatedly informed, West will not bow to such extortion.

We hereby demand that your clients, no later than June 30, 2005, send us a letter confirming in writing that they will not exploit the Unauthorized Masters in any way, shape or form. Their failure to do so will leave West no choice but to immediately commence suit against your clients and all those in active concert with them for, inter alia, willful copyright infringement, violation of his rights of privacy and publicity, unfair competition and tortious interference with the exclusive contractual relations which West has with his recording companies. West shall seek and, based upon the above facts, should obtain the maximum damages available to him, including statutory and punitive damages and attorney's fees. In addition, our client will seek all appropriate declaratory relief and equitable remedies, including the obtaining of an order of seizure and temporary restraining order.

36. On July 1, 2005, Levinsohn wrote Hoffman that "no imminent exploitation" of the Unauthorized Masters was planned by the Miller Defendants and stated that he was in the process of preparing a detailed response to Hoffman's June 22, 2005, letter. A copy of this letter is annexed hereto as Exhibit J.

37. When two additional weeks passed without receiving the promised detailed response, Hoffman on July 15, 2005, sent another letter to Levinsohn again demanding that the Miller Defendants confirm in writing by July 22, 2005, that they would not exploit the Unauthorized Masters. A copy of this letter is annexed hereto as Exhibit K.

38. On July 27, 2005, Levinsohn sent Hoffman an e-mail in which he represented that Miller was "taking no steps to release or otherwise exploit the master recordings." A copy of that e-mail is annexed hereto as Exhibit L.

39. On July 29, 2005, Levinsohn finally responded to Hoffman's letters. In his letter, a copy of which is annexed hereto as Exhibit M, Levinsohn stated that the Miller Defendants refused to agree that they would not exploit the Unauthorized Masters and instead asserted for

9

the first time that they did not need West's permission to distribute the Unauthorized Masters

(despite the fact that they had spent months seeking to obtain such permission).

      40.    On August 3, 2005, Hoffman responded to Levinsohn's letter and made the

following points, among others:

> You claim that your "client's position is that he owns all right, title and interest to
> the master recordings ..." For all of the reasons stated in our previous correspon-
> dence, that is simply not the case. As for your statement that Eric Miller ("Mill-
> er") "asserts that the Recordings were made pursuant to an express understanding
> between Kanye West and Mr. Miller's production company/label, Focus Music
> Group," that assertion is an outright falsehood. If such an agreement had actually
> existed, there would have been no need for Miller to create a "dummy up"
> contract and forge our client's name to it, all for the purpose of defrauding would-
> be distributors of the recordings. ...
>
> Even if the parties had an "express understanding" (and they did not), our client
> was a minor at the time it is alleged to have taken place. 750 Ill. Comp. Stat.
> §30/3-1 (2005); 325 Ill. Comp. Stat. §45/2. Unless the alleged "express under-
> standing" was "approved by the circuit court in the county in which the minor
> resides or is employed" (which it was not), it is voidable. 820 Ill. Compl Stat.
> §20/1(a). You and your client have already been put on notice by Kanye West
> ("West") and his representatives that the alleged agreement is of no force and
> effect. ...
>
> Your claim that Miller does not understand West's position is unbelievable.
> Considering that Miller, according to your letter, "is a Grammy-nominated
> producer and an artist as well," one would think that he would know something
> about exclusive recording agreements. As we are sure that both you and Miller
> are aware, West has an exclusive recording agreement with Roc A Fella Records.
> Even if West wanted to enter into a deal with Miller (and he does not want to do
> so), his contract expressly prohibits him from doing so. Indeed, Roc A Fella
> Records will have valid claims against Miller for tortious interference should he
> attempt to distribute the Unauthorized Master Recordings. ...

Hoffman closed his letter, a copy of which is annexed hereto as Exhibit N, by demanding one

final time that the Miller Defendants confirm in writing by August 8, 2005, that they "are not

exploiting the Unauthorized Masters in any way, shape or form and will not attempt to do so

unless and until there is a final judicial termination in their favor."

41.     As Levinsohn and the Miller Defendants failed to respond to the above letter and have not provided West with confirmation that the Miller Defendants will not exploit the Unauthorized Masters, West has been forced to commence this litigation.

## AS AND FOR A FIRST CLAIM FOR RELIEF AGAINST DEFENDANTS
### (Declaratory Judgment)

42.     West repeats and realleges each and every allegation contained in paragraphs 1 through 41 of this Complaint as if such allegations were fully set forth at length herein.

43.     West has the sole and exclusive right to exploit his identity, including his name and voice, for commercial purposes.

44.     West did not have a contract, either written or oral, with Miller or Focus at the time that the Unauthorized Masters were made, and has never entered into any contractual relationship with either Miller or Focus.

45.     West did not grant and has never granted any rights to Miller or Focus to exploit the Unauthorized Masters or West's identity in any way, shape or form.

46.     West did not enter into the Fraudulent and Forged Agreement with Focus, which agreement the Miller Defendants have admitted was fraudulent, forged and of no force or effect.

47.     Despite repeated demands that they agree not to exploit the Unauthorized Masters, the Miller Defendants have refused to so agree and are now asserting that they own all right, title and interest in the Unauthorized Masters and do not need West's permission to exploit the Unauthorized Masters.

48.     On account of the foregoing, there now exists between West and the Miller Defendants a present, actual, justiciable and genuine controversy in respect of which West is entitled to have a declaration of his rights and further relief as may be just and proper.

11

49.    By reason of the foregoing West is entitled to have judgment entered pursuant to 28 U.S.C. §2201 et seq. declaring that: (a) the Fraudulent and Forged Agreement is void; and (b) the Miller Defendants have no rights to exploit the Unauthorized Masters or West's identity without West's consent.

## AS AND FOR A SECOND CLAIM FOR RELIEF AGAINST DEFENDANTS
### (Violation of Illinois Right of Publicity Act, 765 ILCS 1075/30)

50.    West repeats and realleges each and every allegation contained in paragraphs 1 through 49 of this Complaint as if such allegations were fully set forth at length herein.

51.    West has the sole and exclusive right to control and to choose whether and how to use his identity, including his name and voice, for commercial purposes.

52.    West has never consented to the use by the Miller Defendants of West's identity in connection with the exploitation of the Unauthorized Masters.

53.    The Miller Defendants have, with knowledge that they did not have West's written consent to do so, willfully used and are using West's identity, including his name and voice, in connection with the exploitation of the Unauthorized Masters for their own commercial benefit and advantage including, without limitation, for the purpose of obtaining a distribution deal in relation to the Unauthorized Masters.

54.    The unauthorized use by the Miller Defendants of West's identity for commercial purposes constitutes a violation of Illinois Right of Publicity Act §1075/30-30(a).

55.    As a result of the unauthorized use by the Miller Defendants of West's identity in connection with the exploitation of the Unauthorized Masters, particularly at a time when West is about to release his new album "Late Registration," West has been severely harmed and has suffered damages in an amount to be determined but believed to be not less than $100,000.

12

56.     The actions of the Miller Defendants are such as to warrant an award of punitive damages against them in an amount to be determined but believed to be not less than $200,000.

57.     The unauthorized and continued use by the Miller Defendants of West's identity, including his name and voice, in connection with the exploitation of the Unauthorized Masters has caused and will continue to cause West irreparable harm and severe damage to his commercial reputation for which West has no adequate remedy at law.

58.     Pursuant to §1075/50 of the Illinois Right of Publicity Act, West is entitled to an injunction, inter alia, preventing and restraining the Miller Defendants from any further unauthorized use of his identity, including, but not limited to, in connection with the exploitation of the Unauthorized Masters.

59.     Pursuant to §1075/55 of the Illinois Right of Publicity Act, West is also entitled to an award of the costs of this action and attorney's fees.

### AS AND FOR A THIRD CLAIM FOR RELIEF AGAINST DEFENDANTS
### (Violation of Right to Privacy – Commercial Misappropriation)

60.     West repeats and realleges each and every allegation contained in paragraphs 1 through 59 of this Complaint as if such allegations were fully set forth at length herein.

61.     The actions of the Miller Defendants as described herein constitute commercial misappropriation of West's identify, including his name and voice.

62.     As a result of the misappropriation by the Miller Defendants of West's identity, including his name and voice, in connection with the exploitation of the Unauthorized Masters, West has been severely harmed and has suffered damages in an amount to be determined but believed to be not less than $100,000.

13

63.     The actions of the Miller Defendants are such as to warrant an award of punitive damages against them in an amount to be determined but believed to be not less than $200,000.

64.     The unauthorized and continued misappropriation by the Miller Defendants of West's identity, including his name and voice, in connection with the exploitation of the Unauthorized Masters has caused and will continue to cause West irreparable harm and severe damage to his commercial reputation, harm and damage for which West has no adequate remedy at law.

65.     West is entitled to an injunction, <u>inter alia</u>, preventing and restraining the Miller Defendants from any further misappropriation of his identity, including, but not limited to, in connection with the exploitation of the Unauthorized Masters.

### AS AND FOR A FOURTH CLAIM FOR RELIEF AGAINST DEFENDANTS
#### (Violation of §43(a) of Lanham Trademark Act)

66.     West repeats and realleges each and every allegation contained in paragraphs 1 through 65 of this Complaint as if such allegations were fully set forth at length herein.

67.     The Miller Defendants have fraudulently used and threaten to continue to fraudulently use West's identity, including his name and voice, in connection with the sale, release, distribution and/or attempted sale, release or distribution of the Unauthorized Masters in interstate commerce.

68.     The unauthorized and fraudulent use by the Miller Defendants of West's identity, including his name and voice, in connection with the commercial exploitation of the Unauthorized Masters is likely to cause confusion, or to cause mistake, or to deceive the public as to the affiliation, connection, endorsement, sponsorship and/or association of West with the Miller Defendants and/or the Unauthorized Masters.

14

69.     The aforesaid acts constitute a violation of Section 43 of the Lanham Act, 15 U.S.C. §1125.

70.     The unauthorized and unlawful acts of the Miller Defendants are willful and intended to enable them to trade unlawfully upon the established reputation and success of West, including the upcoming release of his new album "Late Registration" in August 2005, by falsely representing and/or misleading the public into believing that West approves, endorses or is otherwise associated with the exploitation of the Unauthorized Masters.

71.     The Miller Defendants are thereby unjustly enriching themselves at the expense and to the damage and injury of West.

72.     As a result of the violation by the Miller Defendants of §43(a) of the Lanham Trademark Act, West has been severely harmed and has suffered damages in an amount to be determined but believed to be not less than $100,000.

73.     Based upon the intentional and willful nature of the violation by the Miller Defendants of West's rights, such damages should be trebled pursuant to 15 U.S.C. §1117.

74.     The unauthorized, knowing and fraudulent use by the Miller Defendants of West's identity, including his name and voice, in connection with the exploitation of the Unauthorized Masters has and will continue to cause West irreparable harm and severe damage to his commercial reputation for which West has no adequate remedy at law.

75.     Pursuant to 15 U.S.C. §1116, West is entitled to an injunction, inter alia, preventing and restraining the Miller Defendants from any further unauthorized use of West's identity, including his name and voice, in connection with the exploitation of the Unauthorized Masters or otherwise

15

76.     Pursuant to 15 U.S.C. §1117, West is entitled to an award of the costs of the

action and attorneys' fees pursuant.

## AS AND FOR A FIFTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### (Common Law Unfair Competition)

77.     West repeats and realleges each and every allegation contained in paragraphs 1

through 76 of this Complaint as if such allegations were fully set forth at length herein.

78.     The unauthorized, knowing and fraudulent use by the Miller Defendants of West's

identity, including his name and voice, in connection with the exploitation of the Unauthorized

Masters is likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsor-

ship, or approval of the Unauthorized Masters and constitutes unfair competition under the com-

mon law of the State of Illinois.

79.     The Miller Defendants' unauthorized and unlawful acts are willful and intended to

enable them to trade unlawfully upon the established reputation and success of West, including

the upcoming release of his new album "Late Registration" in August 2005, by falsely represent-

ing and/or misleading the public into believing that West approves, endorses or is otherwise

associated with the exploitation of the Unauthorized Masters.

80.     The Miller Defendants are thereby unjustly enriching themselves at the expense

and to the damage and injury of West.

81.     As a result of the unauthorized and fraudulent use by the Miller Defendants of

West's identity, including his name and voice, in connection with the exploitation of the Unauth-

orized Masters, West has been severely harmed and has suffered damages in an amount to be

determined but believed to be not less than $100,000.

82.     The actions of the Miller Defendants are such as to warrant an award of punitive damages against them in an amount to be determined but believed to be not less than $200,000.

83.     The unauthorized, fraudulent and continued use by the Miller Defendants of West's identity, including his name and voice, in connection with the exploitation of the Unauthorized Masters has and will continue to cause West irreparable harm and severe damage to his commercial reputation for which there is no adequate remedy at law.

84.     West is entitled to an injunction, inter alia, preventing and restraining the Miller Defendants from any further unauthorized use of his identity, including his name and voice, in connection with the exploitation of the Unauthorized Masters or otherwise.

## AS AND FOR A SIXTH CLAIM FOR RELIEF AGAINST DEFENDANTS
### (Violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/2-2(a)(2), (3) and (5))

85.     West repeats and realleges each and every allegation contained in paragraphs 1 through 84 of this Complaint as if such allegations were fully set forth at length herein.

86.     The Miller Defendants have fraudulently used and threaten to continue to fraudulently use West's identity, including his name and voice, in connection with the sale, release, distribution and/or attempted sale, release or distribution of the Unauthorized Masters in interstate commerce.

87.     The unauthorized and fraudulent use by the Miller Defendants of West's identity, including his name and voice, in connection with the commercial exploitation of the Unauthorized Masters is likely to cause confusion, or to cause mistake, or to deceive the public as to the affiliation, connection, endorsement, sponsorship and/or association of West with the Miller Defendants and/or the Unauthorized Masters.

17

88.    The Miller Defendants' unauthorized and unlawful acts are willful and intended to enable them to trade unlawfully upon the established reputation and success of West, including the upcoming release of his new album "Late Registration" in August 2005, by falsely representing and/or deceiving the public into believing that West approves, endorses or is otherwise associated with the exploitation of the Unauthorized Masters.

89.    The Miller Defendants are thereby unjustly enriching themselves at the expense and to the damage and injury of West.

90.    The aforesaid deceptive practices constitute a violation of Illinois Uniform Deceptive Trade Practices Act §510/2-2(a)(2), (3) and (5).

91.    The unauthorized, knowing and fraudulent use by the Miller Defendants of West's identity, including his name and voice, in connection with the exploitation of the Unauthorized Masters has caused and will continue to cause West irreparable harm and severe damage to his commercial reputation for which West has no adequate remedy at law.

92.    Pursuant to the Illinois Uniform Deceptive Trade Practices Act §510/3, West is entitled to an injunction, inter alia, preventing and restraining the Miller Defendants from any further unauthorized use of West's identity, including his name and voice, in connection with the exploitation of the Unauthorized Masters or otherwise, and an award of the costs of this action and attorney's fees.

## PRAYER FOR RELIEF

WHEREFORE, West demands judgment against the Miller Defendants, jointly and severally, as follows:

1.    On his first claim for relief, judgment declaring that: (a) the Fraudulent and Forged Agreement is not valid; and (b) the Miller Defendants have no rights to exploit the Unauthor-

ized Masters or West's identity without West's consent.

2.     On his second claim for relief: (a) judgment pursuant to the Illinois Right of Pub-

licity Act §1075/40 in an amount not less than $100,000 and punitive damages in an amount not

less than $200,000; (b) pursuant to Illinois Right of Publicity Act §1075/50, an order enjoining

the Miller Defendants and their officers, directors, agents, employees and representatives from

any further use of West's identity, including his name and voice, in connection with the

exploitation of the Unauthorized Masters or otherwise;

3.     On his third claim for relief: (a) judgment in an amount not less than $100,000

and punitive damages in an amount not less than $200,000; and (b) an order enjoining the Miller

Defendants and their officers, directors, agents, employees and representatives from any further

use of West's identity, including his name and voice, in connection with the exploitation of the

Unauthorized Masters or otherwise;

4.     On his fourth claim for relief: (a) judgment pursuant to 15 U.S.C. §1117 in an

amount not less than $100,000 and treble damages in an amount not less than $200,000; (b) an

order pursuant to 15 U.S.C. §1116 enjoining the Miller Defendants and their officers, directors,

agents, employees and representatives from any further use of West's identity, including his

name and voice, in connection with the exploitation of the Unauthorized Masters or otherwise;

5.     On his fifth claim for relief: (a) judgment in an amount not less than $100,000

and punitive damages in an amount not less than $200,000; and (b) an order enjoining the Miller

Defendants and their officers, directors, agents, employees and representatives from any further

use of West's identity, including his name and voice, in connection with the exploitation of the

Unauthorized Masters or otherwise;

6.     On his sixth claim for relief, an order pursuant to the Illinois Uniform Deceptive Trade Practices Act §510/3 enjoining the Miller Defendants and their officers, directors, agents, employees and representatives from any further use of West's identity, including his name and voice, in connection with the exploitation of the Unauthorized Masters or otherwise;

7.     Awarding West the costs of this action together with reasonable attorneys' fees and expenses as provided by, <u>inter alia</u>, 15 U.S.C. §1117, 1075 ILCS 1075/55 and 510 ILCS 510/3.

8.     Awarding West such other and further relief as the Court may deem just and proper.

Dated:  August 28, 2005

                        KANYE WEST


                        By: _____
                              One of his attorneys


HILL, GILSTRAP & BALSON
Ronald H. Balson
Carrie A. Hall
303 West Madison Street, Ste. 1050
Chicago, Illinois 60606
Tel.: (312) 853-2920

# Exhibit A

15-02-05    16:43    From-Pickwick Group                    +0044 020 9236 2312    T-867    P.003/014    F-184

02/03/2005 02:06 FAX 1 201 866 5444        SUBLIMINAL RECORDS                                    ☒002

# Focus Music Group



## ARTIST RECORDING AGREEMENT

The following shall constitute an agreement ("Agreement") between Focus Music Group ("Company") and KANYE WEST ("Artist") with respect to Artist exclusively recording for Company, during the term ("Term") of this Agreement and master recordings embodying Artist performances ("Master or Masters").

1. **ENGAGEMENT:** Company hereby engages Artist to render such services as it may require in the recording of Masters and the production of Records and Artist hereby accepts such engagement and agrees to render such services exclusively worldwide, to Company during the term of this Agreement.

2. **TERM AND OPTIONS:** The term of this Agreement shall commence as of the date hereof and shall continue for one (1) year ("Initial Period"). Artist hereby irrevocably grants to Company the option to extend the Initial Period upon the same terms and conditions of the Initial Period for two (2) further consecutive renewal periods ("Option Period Each Option Period shall be exercised automatically, unless Company gives written notice to Artist within thirty (30) days prior to the date that the Contract Period would otherwise expire, that Company does not intend on exercising its right to exercise the right to extend this Agreement under the next Option Period.

3. **RECORDING REQUIREMENTS:** During the respective Contract Period, Artist agrees to record for Company sufficient Masters to comprise a minimum of one (1) long-playing phonograph record album (LP) per Contract Period, embodying Compositions not heretofore recorded by Artist, in a Company approved recording studio, at times to be mutually agreed upon. Company shall have the right and opportunity to have a representative attend each recording session. Company and Artist shall jointly select the Compositions to be recorded and each Master shall be subject to Company's approval as technically and commercially satisfactory for the manufacture and sale of Records. All Masters shall be produced by producers mutually approved by Artist and Company. Each LP shall comprise no less than ten (10) nor more than twelve (12) Masters. Upon Company's request, Artist shall re-record any Composition recorded hereunder until a recording which in Company's sole judgment is satisfactory for the manufacture and sale of Records shall have been obtained. Should Artist fail to appear at any recording session of which Artist has been given reasonable notice, for any reason, unless Artist gives forty-eight (48) hours notice to Company of an inability to appear as scheduled, Company shall have the right to charge any of its out-of-pocket expenses in respect of such session against Artist's royalties if and when earned.

Received  03-02-05  16:32        From-1 201 866 5444            To-Pickwick Group        Page  002

15-02-05    18:43    From-Pickwick Group                    +9844 020 8286 2912    T-957   P.004/014   F-134

02/03/2005 02:06 FAX 1 201 886 5444        SUBLIMINAL RECORDS                                   Ⓩ003

## 4. RECORD PRODUCTION, EXPENSES & ADVANCES:

a) All Recording Costs or Advances paid or payable by Company under this Agreement shall be an Expense as defined in this Agreement. Recording Costs incurred by Company in respect of Masters in excess of the recording budget theretofore approved by Company, shall be an Expense as defined in this Agreement. Artist shall not incur any Recording Costs, not previously approved by Company in the Recording Budget, without Company's written approval, and Artist failure to act accordingly shall be deemed a material breach of this Agreement.



## 6. ROYALTIES: Company agrees to pay royalties to Artist for each unit sold, according to the following schedule:

a. Company shall pay to Artist as a royalty, twelve percent (12%) of the Net Receipts received by Company, from exploitation of the Masters, including sales of Records or of any flat fee received by Company for licensing or sublicensing the Masters less all Expenses agreed to herein (hereinafter Artist's Royalty].

b. Net Receipts shall mean Gross Receipts received by Company less Expenses.

c. Any bona fide reasonable and or agreed fees paid to third party distributors by Company or deducted from Company's Gross Receipts will be included as deductible expenses for purposes of calculating Net Receipts.

d. No royalties shall be payable on Records

i) furnished as free or bonus Records to members, applicants, or other participants in any record club or other direct mail distribution method.

ii) on Records distributed for promotional purposes to radio stations, television stations or networks, record reviewers or other customary recipients of promotional Records; on so-called "promotional samples" Records.

iii) on Records sold as scrap or so-called "cut-outs: and on Records distributed on a so-called "no-charge" or "free" basis (such as, but not limited to, Records commonly described in the record industry as "free-goods" or "freebies", and which shall be specifically limited to Two [2] per Ten [10] sold) whether or not the recipients of such Records are affiliated with us and whether or not such Records are intended for sale by the recipients thereof.



2

## 8. ROYALTY ACCOUNTING:

a) Statements as to royalties payable hereunder shall be sent by Company to Artist on or before the thirtieth day of September of the semi-annual period ending the preceding June 30, and on or before the 31st day of March for the semi-annual period ending the preceding December 31st, together with payment of accrued royalties, if any, earned by Artist hereunder during such semi-annual period, less all Advances and charges under this Agreement. Company shall have the right to retain, as a reserve against charges, credits, or returns, such portion of payable royalties as shall be reasonable in our best business judgment, however in no event shall such retained reserve exceed a sum equal to Thirty-five (35%) percent of the royalties payable to you in the applicable period. Except as expressly provided herein to the contrary, Advances hereunder shall not be recouped from mechanical royalties payable hereunder. Notwithstanding the foregoing, any amounts retained by Company as reserve against charges, credits or returns shall be liquidated no later than Four (4) accounting periods following the period in which the sales, to which said reserves apply, occurred.

b) No royalties shall be payable to Artist in respect of sales of Records by any of Company's distributors or licensees until payment has been received by us or credited to us. Sales by any such licensees shall be deemed to have occurred in the semi-annual accounting period during which such licensees shall have rendered to us accounting statements for such sales.

c) Royalties in respect of the sale of Records outside of the United States shall be computed in the national currency in which Company is paid by Company's licensees, shall be credited to Artist's royalty account hereunder at the same rate of exchange as we are paid, and shall be proportionately subject to any transfer or comparable taxes which may be imposed upon Company's receipts. In the event we shall not receive payment in the United States dollars in the United States in respect thereof such payment shall not be credited to your royalty account hereunder. Company shall, however, if Company is able to do so, accept such payment in foreign currency and deposit in a foreign bank or other depository, at your expense, in such foreign currency, such portion thereof, if any, as shall equal the royalties which would have actually been payable to Artist hereunder in respect of such sales had such payments been made to us in United States dollars in the United States and Company shall notify you thereof promptly. Deposit as aforesaid shall fulfill our royalty obligations hereunder as to such record sales.

d) Artist shall be deemed to have consented to all royalty statements and all other accountings rendered by Company hereunder and each such royalty statement or other accounting shall be conclusive, final, and binding, shall constitute an account stated, and shall not be subject to any objection for any reason whatsoever unless specific objection in writing, stating the basis thereof, is given by Artist to us within Two (2) years after the date rendered.

e) Company shall maintain books of account concerning the sale of Records hereunder. Artist, or a certified public accountant, in Artist's behalf, may, at Artist's sole expense, examine our said books relating to the sale of Records hereunder solely for the

3

purpose of verifying the accuracy thereof, only during our normal business hours and upon reasonable written notice. Company's books relating to any particular royalty statement may be examined as aforesaid only within two (2) years after the date rendered and Company shall have no obligation to permit Artist to so examine our such books relating to any particular royalty statement more than once.

f) All monies paid pursuant to this Agreement to Artist or on Artist's behalf, on behalf of any person, firm or corporation representing Artist, other than royalties payable pursuant to this Agreement, shall constitute Expenses as defined herein.



10. **MECHANICAL LICENSING AND ROYALTIES:** All musical compositions or material recorded pursuant to this Agreement, which are written or composed, in whole or in part, or owned or controlled directly or indirectly by Artist or any producer of Masters subject thereto (herein "Controlled Compositions"), shall be and are hereby perpetually licensed to Company for the United States and Canada at a royalty per selection equal to Seventy-five (75%) percent of the mechanical statutory per selection rate (with regard to playing time) effective on the date of initial U.S. commercial release of the Masters concerned hereinafter sometimes to be referred to as the "Per Selection Rate".

a) Notwithstanding the foregoing, with respect to foreign sales, the royalty per selection shall be equal to seventy-five percent (75%) of the minimum statutory mechanical royalty rate as established by the mechanical rights society having jurisdiction over the territory in which Records are manufactured.

b) Notwithstanding the foregoing, the maximum aggregate mechanical royalty rate which Company will be required to pay in respect of any single, E.P. or L.P., regardless of the total number of compositions contained therein, shall not exceed Two (2) times, five (5) times, and Ten (10) times the "Per Selection Rate" respectively.

c) All mechanical royalties payable hereunder shall be paid on the basis of net Records sold hereunder for which royalties are payable to Artist pursuant to this Agreement.

d) Accounting for royalties in respect of the compositions referred to above shall be rendered semi-annually within ninety (90) days of the end of each semi-annual period as set forth in paragraph 8 herein.

e) Artist agrees not to record any Controlled Composition or other song recorded pursuant to this Agreement without Company's written consent, for the later of i) five (5) years subsequent to the date of release by Company of any Controlled Composition or song recorded hereunder; or ii) two (2) years subsequent to the expiration or other termination of the Term of this Agreement.

f) Payments made for mechanical royalties under this Agreement are considered an Expense.

4

## 10. NAME & LIKENESS:

a)  During the Term of this Agreement and for as long as Company shall be entitled to sell the Records derived from Masters produced under this Agreement, Artist hereby licenses to Company the right, and to license others the right, to use Artists' name, likeness, voice, biographical material or other identification for use in association with any promotion, marketing or advertising, in any medium now known and existing or that is created in the future, of the sale of Records pursuant to this Agreement. Further, Artist will not license or consent to the use of Artist's name, likeness, voice, biographical material or other identification, for or in connection with the recording or exploitation of Records under this Agreement by or for anyone other than Company.

b)  Artist shall apply for and obtain in Artist's name, and at Artist's expense, federal registration of a trademark and/or service mark for Artist's professional name and /or logo in connection with the use thereof in all areas of the entertainment industry, including, without limitation, in connection with the recording and sale of phonograph records, the establishment of fan clubs, the rendition of concerts and live performances, and the sale of clothing and other merchandise.  If Artist fails to apply for and obtain federal registration of any such trademark or service mark, Company shall thereafter have the right to apply for and obtain federal registration of any such trademark or service mark, in Artist's name, at Artist's expense and Artist hereby appoints Company as its attorney-in-fact, coupled with an interest, for the purpose of applying for and obtaining such registration.

## 11. MASTER RIGHTS:  All songs recorded and/or submitted during the Term shall be recorded by Artist on Company's behalf and all Records made therefrom, together with the performances embodied therein, shall, from the inception of their creation, be entirely the property of Company in perpetuity, throughout the World, free of any claim whatsoever by Artist or by any persons deriving any rights or interests from Artist. For the purposes hereof, all such Master recordings shall be works made for hire under the United States Copyright Law.  In the event such works are deemed not to be works made for hire, then pursuant to this Agreement you hereby transfer your rights to the copyrights in the Masters to Company. Artist agrees to execute any documents to fulfill the transfer of copyright to the Masters upon request by Company.  Company shall have the right to secure registration of the sound recording copyright in and to the Masters in Company's name as the owner and author thereof and to secure any and all renewals of such copyright. Nevertheless, you shall, upon our request, execute and deliver to us any assignments of copyright (including renewals and extensions thereof) in and to such Master recordings as we may deem necessary.  Company (and its Licensees) shall have the sole and exclusive right to use the Masters throughout the Territory or any part thereof in any manner it sees fit, including, without limitation, the sole and exclusive right in perpetuity and throughout the Territory:

a)  To use and publish the names (including all professional, group, and assumed

5

15-02-05    16:44    From-Pickwick Group                    +0044 920 3236 2312    T-967    P.008/014    F=134

02/03/2005 02:07 FAX 1 201 866 8444        SUBLIMINAL RECORDS                    ☒007

or fictitious names), photographs and biographical material or Artist, in connection with the promotion, exploitation and sale of Records; and

b) To release derivatives of any one or more of the Masters on any medium or device now or hereafter known, under any name, trademark or label which Company and its Licensees may from time to time elect.

12. **VIDEO RIGHTS:** During the term hereof, Company shall have the exclusive worldwide right to manufacture and distribute Videos for commercial and/or promotional purposes including any commercial sale or other exploitation of so-called "long form" video programs or authorize others to do so.

a) All recording and production costs directly or indirectly incurred in connection with the creation of the audio-visual recording hereunder shall be considered Expenses.

b) In the event that Company shall license through our normal distribution channels, as opposed to directly manufacturing and selling same, the royalty payable by Company to you shall be the percent of Company's Net Receipts derived from such licenses as set forth in paragraph 6 of this Agreement after deducting (a) any and all proper and reasonable direct costs and/or third party payments in connection with the creation, manufacture and exploitation or use of said audio-visual recordings from all Net Receipts derived therefrom and (b) an additional fee in lieu of any overhead or distribution fee of Ten (10%) percent of the Net Receipts in connection therewith.

I) With respect to audio-visual recordings embodying your performances which are manufactured and sold directly by Company or its distributors as opposed to licensees of Company, you shall be entitled to a royalty which shall percent of Company's Net Receipts derived from such licenses as set forth in paragraph 6 of this Agreement after deducting (a) any and all proper and reasonable direct costs and/or third party payments in connection with the creation, manufacture and exploitation or use of said audio-visual recordings from all Net Receipts derived therefrom and (b) an additional fee in lieu of any overhead or distribution fee of Ten (10%) percent of the Net Receipts in connection therewith.

13. **WARRANTIES AND REPRESENTATIONS:** Artist warrants and represents the following:

a) Artist is not now and during the Term shall not be a party to or bound by any contract or agreement which will interfere in any manner with the manufacture and marketing and sale of the Recording by Company. Artist is under no disability, restriction or prohibition with respect to Artist's right to sign and perform under this Agreement.

b) The songs and performances embodied in the Recordings, and any use thereof by Company or its grantees, licensees, or assigns, will not violate or infringe upon the rights of any third party. Artist has secured all proper licenses for the right to perform

6

and record all or any part of the performances or recording embodied on Artist's Master.

c) Artist agrees to and does hereby indemnify, save and hold Company harmless of and from any and all loss and damage (including reasonable attorney's fees) arising out of or connected with any claim by any one or more third parties or any act by Artist which is inconsistent with any of the warranties, representations, and/or agreements made by Artist herein, and agrees to reimburse Company on demand for any payment made by it at any time with respect to any liability or claim to which the foregoing indemnity applies. Pending the determination of any claim involving such alleged breach or failure, Company may withhold same due Artist hereunder in an amount consistent with such claim. Company shall have the right at all times, in its sole discretion to control the defense of any claim.

d) You expressly acknowledge that your services hereunder are of a special, unique, and intellectual character which gives them peculiar value, and that in the event of a breach by you of any term, condition, or covenant hereof, we will be caused irreparable injury. You expressly agree that in the event you shall breach any provisions of this contract, we shall be entitled to seek injunctive relief and/or damages, as we may deem appropriate, in addition to any other rights or remedies available to us, and we shall have the right to recoup any such damages resulting from any such breach, which shall be reduced to a final, adverse judgment, from any monies which may be payable to you hereunder or under any other agreement between you and us or our affiliates.

e) During the Term of this Agreement, if required by law or any other agreement that Company may become a party to, Artist shall become and remain a member in good standing of any appropriate labor union or unions. If Company becomes a party to any such union agreement, Company shall give Artist written notice of such action.

f) Artist warrants that it is the sole owner of its professional name and that Artist has the sole and exclusive right to use and to allow others to use the Artist's professional name in connection with the manufacture, advertising and the sale of Records.

g) Artist understands that the record industry and sales of records is speculative and that Company makes no warranty or representations as to the success of the sales of Artist's Records distributed and sold hereunder.

14. SUSPENSION AND DEFAULT:

a) Company reserves the right by written notice to Artist to suspend its obligation hereunder and/or to extend the expiration date of the then-current Contract Period for the duration of the following contingencies if by reason of such contingencies it is materially hampered in the recording, manufacture, distribution or sale of Records, or its normal business operations become commercially impractical: labor disagreements, fire, catastrophe, shortage of materials or any cause beyond Company's control.

b) In the event of any default or breach by Artist in the performance of any of Artist's obligation or warranties hereunder, Company, by written notice to Artist, in

7

02/03/2005 02:07 FAX 1 201 868 5444        SUBLIMINAL RECORDS                          ☐ 009

addition to any other rights or remedies which it may have at law or otherwise, at its election, may terminate the Term or may suspend its obligations hereunder for the duration of such default or breach and/or may extend the expiration date of the then-current Contract Period for a period equal to all or any part of the period of such default or breach.

c) In the event of any default or breach by Company in the performance of any of its obligations or warranties hereunder, Artist shall give Company written notice of such default. Company shall then have sixty (60) days to cure such breach before being declared by Artist to be in breach or default of this Agreement.

15. **APPROVAL:** Wherever in this Agreement Artist's approval or consent is required by Artist, Artist's approval shall not be withheld unreasonably and failure to give such approval or disapproval within seven (7) days of notice by Company shall be deemed an approval by Artist. Wherever in this Agreement the subject matter is mutually agreeable by the parties, then in the event of a dispute, then the final decision shall be controlled by the Record Company.

16. **ASSIGNMENT:** Company shall have the right to assign this Agreement or any of Company's rights hereunder or to delegate our obligations hereunder or any part thereof to any third party. Specifically, but not limiting the generality of the foregoing, Company shall have the right to enter into a long term recording, production or distribution agreement, on terms no less favorable than those contained herein, for the provision of your services as exclusive recording artists or assigning any of our rights hereunder with any "Major" record company or nationally distributed independent label, (as those terms are understood in the recording industry). Artist's rights and obligations hereunder are personal and non-delegable.

17. **SUCCESSOR IN INTEREST:** This Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective heirs, successors, permitted assigns, and representatives.

18. **INVALIDITY OF TERMS:** If any clause, sentence, paragraph or part of this agreement, or the application thereof to any person, shall for any reason be adjudged by a court of competent jurisdiction to be invalid, such judgment shall be limited and confined in its operation to the clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgment shall have been rendered and to the person involved.

19. **NOTICES:** All notices hereunder required to be given to Company shall be sent to Company at its address, and all royalty statements (and payments) and all notices to Artist shall be sent to Artist at Artist's address. All notices shall be in writing and shall be sent by registered mail or certified mail, return receipt requested. The day of mailing of any such notice shall be deemed the date of the giving thereof. Royalty statements (and payments) may be sent by regular mail. All notices shall be served upon Company to the attention of the President.

20. **APPLICABLE LAW:** This agreement has been entered into in the State of Illinois

8

and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of Illinois applicable to contracts entered into and performed entirely within the State of Illinois, with respect to the determination of any claim, dispute or disagreement which may arise out of the interpretation, performance or breach of this agreement. Any process in any action or proceeding commenced in the courts of the State of Illinois or elsewhere, arising out of any such claim, dispute or disagreement, may among other methods be served upon Artist by delivering or mailing the same, via registered or certified mail, addressed to Artist at the address first above written or such other address as Artist may designate pursuant to paragraph 14 hereof. Any such delivery or mail service shall be deemed to have the same force and effect as personal service with the State of Illinois or the jurisdiction in which such action or proceeding may be commenced.

21. **AMENDMENT:** This writing sets forth the entire understanding between the parties with respect to the subject matter hereof, and no modification, amendment, waiver termination or discharge of this agreement shall be binding upon the Company unless confirmed by a written instrument signed by an authorized officer of the Company. No waiver of any provision or or any default under this Agreement shall constitute a waiver by Company of compliance thereafter with the same or any other provision or its right to enforce the same or any other provision thereafter.

22. **DEFINITIONS:** For the purpose of this Agreement, the following terms shall have the following meaning:

"Advance" shall mean a pre-payment of royalties.

"Audio-Visual Recordings" ("Videos") shall mean devices reproducing audio performances or recording artists together with a visual image for home use or otherwise, embodying Artist's performances.

"Budget Record Line" or "Low Priced Record Line" shall mean Records sold for less than 50% of the SRLP.

"Compositions" shall mean any single musical composition, irrespective of length, including all spoken words and bridging passage and a medley.

"Contract Period" shall mean any period of the Agreement wherein a term or obligation may be applicable either in the Initial Period or any subsequent Option Periods.

"Controlled Compositions" shall mean all musical Compositions or material recorded pursuant to this Agreement, which are written or composed, in whole or in part, or owned or controlled directly or indirectly by Artist or any producer of Masters subject thereto.

"Delivery" shall mean Company's receipt of newly-recorded commercially and technically satisfactory Masters to constitute the Record required to be given to Company as per this Agreement (mixed and mastered), together with all necessary licenses,

9

15-02-05    16:45    From-Pickwick Group         +0044 020 8236 2312    T-807   P.012/014   F-134

02/03/2005 02:07 FAX 1 201 866 5444        SUBLIMINAL RECORDS                    Ø011

approval, consents and permissions and all Artwork to be used in connection with the production and distribution of Records derived from the Masters recorded hereunder.

"Expenses" shall mean all expenses incurred under this Agreement including all Recording Costs, as that term is defined herein, payments to union pension and welfare funds, editing costs, distribution fees, licensing fees, payroll taxes and other payments to third parties on your behalf, tour support, liability and medical insurance and legal accounting fees payable to your own legal counsel or accountant (if any such payments are actually made by us) and customary artwork, all taxes, mechanical royalties payable to third parties or payable to Artist hereunder, manufacturing, packaging charges, or legal fees payable on artist's behalf, or fees associated with filing copyright or trademark fees, all costs attributed to promotion, marketing and advertising expended in furtherance of the sale of Records produced from the Masters, and any bona fide reasonable and or agreed fees paid to third party distributors by Company or deducted from Company's Gross Receipts.

"Long-Playing" ("LP") shall mean a Record that has no less than ten (10) Compositions and being no less than forty (40) minutes in duration.

"Master Recording" ("Master" or "Masters") shall mean any original recording, production, and/or manufacture of Records, together with any derivatives thereof (other than Records ).

"Mid-Priced Record Line" shall mean Records sold for fifty percent (50%) to seventy-five percent (75%) of the SRLP.

"Net Receipts" shall mean the amount received by Company from sales or licenses of Records after deducting any and all direct Expenses, costs, taxes and/or third party payments in connection with the creation, production, manufacture and exploitation or use of such Records, Masters or Videos recorded or produced under this Agreement.

"Net Sales" shall mean sales of Records paid for or credited and not returned except as specifically set forth to be different in this Agreement.

"Records," shall mean all forms of sound reproductions whether now known or unknown, on or by which sound may be recorded for later transmission to listeners, embodying sound, including, without limitation, discs of any speed or size, vinyl, compact disc, reel-to-reel tapes, cartridges, cassettes, audiovisual recordings or any other configurations.

"Recording Costs" shall mean all costs incurred with respect to the production of Masters embodying the Artist's performances, including audio visual recordings, and which are customarily recognized as Recording Costs in the phonograph record industry including but not limited to all expenses incurred in connection with the production, mixing and mastering of audio and/or visual masters and all payments and/or advances to Artist hereunder, as well as payments to all of the musicians (including without

Received    03-02-05    16:32    From-1 201 866 5444        To-Pickwick Group        Page 011

limitation, instrumentalists, leaders, arrangers, orchestrators, copyists and contractors) vocalists and producers, if any, rendering services in connection with any recordings hereunder, payments to union pension and welfare funds, costs of cartage and instruments hire, studio or hall rentals, editing costs payroll taxes and other payments to third parties on Artist's behalf related to recording costs, fees to third party producers or side artists, fees for replay or a sampling licenses, and other reasonable expenses incurred by Company for the purpose of production of the Masters.

"Suggested Retail List Price" ("SRLP") shall mean with respect to Records sold for Distribution in the United States, Company's suggested retail list price in the United States during the applicable accounting period. It being understood that a separate calculation of the suggested retail list price shall be made for each price configuration of Records manufactured and sold by Company; and (ii) with respect to Records sold hereunder for Distribution outside the United States, Company or its licensees' suggested or applicable retail price in the country of manufacture or sale, as Company is paid, or, in the absence in a particular country of such suggested retail list price, the price as may be established by Company or it licensee(s) in conformity with the general practice of the recording industry in such country, provided that Company shall not be obligated to utilize the price adopted by the local mechanical copyright collection agency for the collection of mechanical royalties. Notwithstanding anything to the contrary contained herein, the Suggested Retail List Price for premium Records shall be Company's actual sales price of such Records.

"Term" shall mean the duration of the Agreement including the Initial Contract Period and subsequent Option Periods during which Artist accepts and agrees to render services to the Company as well as which licensing right pertaining to the production of Records exclusively to the Company.

"Territory" shall mean the World.

23. **DISTRIBUTION AGREEMENT:** In the event Company enters into a distribution agreement with any Distributor of Records, and in any event this Agreement is in conflict with the Agreement between Company and Distributor for the distribution of Artist's Records, the Distribution Agreement terms shall control only as to those terms inconsistent and in conflict with the terms of this Agreement. However in no event shall the term of a Distribution Agreement affect Artist's Record Royalty Basic Rate.

27. **RIGHT TO LEGAL REPRESENTATION:** Artist represents and warrants that Artist has read this Agreement and Artist understands that this is an important legal document. Artist hereby represents and warrants that Artist has been advised of its right to seek independent legal counsel in connection with the negotiation and execution of this agreement and that Artist has either retained and has been represented by such legal counsel or has knowingly and voluntarily waived its right to such legal counsel and desires to enter into this agreement with the benefit of independent legal representation.

11

15-02-05    15:46    From-Pickwick Group                +0044 020 8236 2912   T-897   P.014/014   F-134

02/03/2005 02:08 FAX 1 201 866 5444       SUBLIMINAL RECORDS                        ☒013

The effective date of this Agreement shall be the _19 th_ day of
MAY _____ 1995.

RECORD COMPANY

By: _____ , President
    Eric Miller

ARTIST: _Kanye West_
Printed Name p/k/a _KANYE WEST_

12

# Exhibit B

## Allison K. Finley

**From:** Jeffrey Pringle [jeff@johngaltentertainment.com]
**Sent:** Thursday, February 24, 2005 11:01 AM
**To:** afinley@dslmh.com
**Subject:** Kayne Old Tracks

*Get name to monopoly. at Midem*

Dear Allison:

I could use a little help. We have been approached to fund a deal for 10 unreleased Kayne tracks. Under the agreement, I guess Kanye did these recording in 1995 with Focus Music Productions of Chicago, IL. There intentions are to have us distribute the record in North America for them, I believe they already have a deal in place for Europe. We were hoping you would be kind enough to let us know if this company's warranties in their recording agreement with Kanye are valid, and there is no other paperwork or copyright transfer for these recordings that would prohibit us from doing business with Focus. We have to pay $450,000 upfront, but feel a little uneasy about it, even though the paperwork looks just fine. I can send you copies of the agreement that I am questioning, if need be. Please give me a ring if you like and I appreciate any sort of help you can be.

*— Eric Miller*

*Steve Hulme NYC.*

Best

Jeffrey Pringle
John Galt Entertainment, Inc
2817 West End Ave #126
Nashville, TN 37203
407-361-7609
aol IM jeffreypringle

1

# Exhibit C

Alison K. Finley

| | |
|---|---|
| **From:** | Steve Hulme [steviehulme@yahoo.com] |
| **Sent:** | Thursday, March 17, 2005 1:52 PM |
| **To:** | afinley@dslmh.com |
| **Subject:** | Kanye West Contact and Proposal |

Hi Alison -

Thank you for calling me today, good to talk to you.

Below is the contact details and the proposal from the owner of the recordings, Eric 'E SMOOVE' Miller, which he would like to reach Kanye, or Kanye's camp at least.

Alison, my friend Eric 'E SMOOVE' Miller and Kanye West recorded music together in Chicago when Kanye was just starting out, back in 1995/96 - E Smoove is trying to contact Kanye, as he wants to release these recordings, along with other recordings by other artists from the same period as a compilation of Chicago Southside Sessions.
Rather than just go ahead and release this record, Eric wanted to reach out to Kanye directly first with a proposal for all to benefit from.
Eric Miller is happy to receive a call from Kanye's managers, or yourself, to discuss this project as soon as possible - please feel free have somebody contact him, but please c.c. me on any email correspondence to Eric Miller.

Best Regards, hope it works out fair for everybody.

Steve Hulme
201-658-3989

HERE IS THE EMAIL/PROPOSAL TO KANYE FROM ERIC MILLER:

To:Kanye West

From:Eric E Smoove Miller

Dear Kanye,

Congratulations on all of your success, its good to see you achieving all of your dreams and making a difference in the process. I've always looked at you as a little brother and its made me very proud to watch you grow as a producer and an artist.

The reason for my letter is simple.  I am preparing a Chicago Unreleased project with several of my past artists and I would like to anchor it with some of the songs from the album we were working on back in ¯95/96. I would like to release this with your blessing. This album would also include our friend "Phenom" and several other artists I've been working with over the years. This project won't require any participation from you, but it will be a great way to gain some exposure for these Chicago artists on an international level. I would not look to release any of your songs as singles and it would be clearly marked as pre-stardom works, so it should not cast any confusion towards your upcoming album.

As far as the business goes I expect to sell approximately 150,000 units. I propose to pay you 40% of the net which would be approximately $250,000 plus about another $90,000 in mechanicals based on a 3/4 statutory rate. I will pay for all manufacturing, promotion and marketing. I will also pay the other artist from my side of the net.  I believe we could sell as many 500,000 units worldwide and I would be open to placing a maximum cap on manufacturing, so as not to attract too much attention.  At 500,000 units I project you would make approximately $ 1.3 million including mechanical royalties.  I plan to get 90 day terms with the distributors and can turn this project around relatively quick.

In addition, I'm sure there are countless Chicago artists that are looking for you to put them on and I realize despite your best intentions, there is only so much that one person can do.  We could continue the series on a smaller level as Kanye West Presents allowing

1

you to give more Chicago artist exposure and give you an independent resource for
developing new talent who can ultimately be signed to your label.

I look forward to your response.

Sincerely,

Eric 'E Smoove' Miller
708 790 0215 (cell)
708 748 0621 (off)
ESMOOVEFMG@aol.com

2

# Exhibit D

## Alison K. Finley

| | |
|---|---|
| **From:** | monopoly [monopoly@nextel.blackberry.net] |
| **Sent:** | Thursday, March 17, 2005 11:50 AM |
| **To:** | Allison Finley |
| **Subject:** | Fw: E Smoove Compilation with Kanye unreleased songs |

Check this out... :)
-----Original Message-----
From: ESMOOVEFMG@aol.com
Date: Thu, 17 Mar 2005 16:30:01
To:monopoly@nextel.blackberry.net
Subject: Re: E Smoove Compilation with Kanye unreleased songs

That contract that Allison has is a non issue, it was just a dummy up we were using to get
the distributors to even talk to us.  It was never supposed to leave the Broker's hands
but one of the distributors must have gotten anxious while we were researching the
numbers. As far as his Mom goes, she may remember when Kanye was working with me because
she brought him to me at the studio in Crestwood. I recall you being around then once or
twice also. Honestly, we were doing things very informally so I don't remember if we were
waiting to get a deal to do the contracts or not. If it's confusing just call me I'm in
the office now. 708 747 8900.

Thanks,

e
BlackBerry service provided by Nextel

# Exhibit E

# Alison K. Finley

**From:** ESMOOVEFMG@aol.com
**Sent:** Wednesday, March 23, 2005 5:19 PM
**To:** Donda.west@sbcglobal.net
**Subject:** E Smoove- "Chicago Unreleased" Compilation Proposal

Dear Ms. West,

As per our phone conversation, here is the proposal regarding the "Chicago Unreleased" compilation. I appreciate your time and consideration in this matter and I hope that with more information you will reconsider. I respect the efforts being made to further the Kanye West brand and understand that there is an ever evolving bigger picture. As a Kanye fan, I would never want to detract from that.

As a twenty year music industry veteran, I know that virtually no artist appears out of nowhere, we all have history. This is Kanye's and it is not one to be ashamed of. Every artist has a voice and we hope that, that voice evolves and matures as Kanye's indeed has but that does not discount the relevance of his original voice. This project is at it's least a documentation of that. At it's best it is offering a look into how an artist can start out with a small independent production company from Chicago and emerge as a major international superstar. It also provides an indirect way for him to maintain his underground credibility as his mainstream position continues to expand.

The reality is that Kanye is much too big of a star for this underground project to hurt him but it could certainly allow an outlet for Kanye's previous works and generate quite a bit of money in the process with no effort required on his part. This is also another opportunity for him to indirectly help even more Chicago artists get their voices heard.

I would offer the opportunity for you to approve all artwork used in connection to this so that you can confirm this is in no way being depicted as current material being supported by Kanye. I would also be willing to place a cap of 500,000 units on the amount pressed and distributed internationally, which is a fraction of his previous album sales.

There are 21 total songs on the comp and 8 are Kanye's . These are songs Kanye recorded while making an album with my production company back in '95-96. I would not release any of Kanye's tracks as singles or use his likeness in any artwork and he wouldn't be required to do anything in connection to this. I would just like his blessing. I will arrange for him to be paid directly by the distributor through a letter of direction and I will give him a proper accounting.

25 To Life
I Keep MC's Lookin Out
There Are None
My People Get Down
What Am I To You ??
Real Nigga Live
Stop Frontin'
Are We Goin Far?

The other artist featured on the album are Phenom whom Kanye knows very well and Pookie another artist I've worked with over the years.

The Numbers:
I propose to pay Kanye 50% of the net. I will subtract broker fees, manufacturing, shipping, and Kanye mechanicals from the top. I will pay the other artist royalties and mechanicals from my end after the split.

After testing the waters with a few distributors, I am confident we can sell a minimum 150,000 units at a minimum of $6.00 a unit. I would like to propose a 50/50 split of the net.

At 150,000 units that would net Kanye $327,500 plus another $72,000 in Mechanicals.
At 500,000 units that would net Kanye $1,092,500 plus another $240,000 in Mechanicals.
We can put a 500K cap on manufacturing if needed to keep it from attracting too much attention. I strongly
believe we can hit the 500K mark internationally without making too much noise.

Minimum Breakdowns:
150,000@$6.00 = $900,000
- 90,000 broker fee
- 73,500 manufacturing
- 10,000 shipping approx
- 72,000 mechanicals (Kanye)
Net: $654,500
Kanye: $327,500 + $72,000 = $399,500
Focus Music Group : $327,500

# Exhibit F

# DAVIS SHAPIRO LEWIT MONTONE & HAYES, LLP

**NEW YORK**　　　　　**BEVERLY HILLS**　　　　　**SAN FRANCISCO**

AFFILIATED WITH:
BLOOM HERGOTT DIEMER ROSENTHAL & LAVIOLETTE, LLP　　　　　March 24, 2005

**Via E-Mail**

Mr. Eric Miller

　　　**RE:**　**Kanye West**

Mr. Miller:

　　　This firm represents Kanye West.

　　　It has come to our client's attention that you are in possession of certain master recordings embodying the performances of Kanye West (the "Masters"). Further, it our understanding that you and/or persons working in concert with you, are planning to exploit or have exploited the Masters.

　　　As you are aware, neither Mr. West nor any authorized agents or representatives of Mr. West, have granted you the right to exploit the Masters. Accordingly, you are hereby placed on notice that any exploitation by you (or persons authorized by you) of the Masters, whether commercially, promotionally or otherwise, constitutes an infringement of our client's rights under applicable federal and state laws, including without limitation, intentional copyright infringement, breach of our client's publicity rights, fraud, as well as, what amounts to tortious interference with our client's actual and prospective business relationships.

　　　In light of the foregoing, demand is hereby made that you immediately cease and desist (and advise all third-parties authorized by you), to cease and desist from any manufacture, sale or distribution of the Masters and that you destroy all such Masters (and provide us with written certification of such destruction) no later than the close of business on Monday, April 4, 2005. Additionally you must provide us with a list of all distributors with whom you have contacted to discuss the exploitation of the Masters. If you fail to comply with the foregoing, our client shall take all necessary legal actions, including but not limited to seeking injunctive and other equitable relief to prevent you or any third party from the manufacture, distribution, sale or other exploitation of the Masters.

　　　Nothing contained herein nor omitted here from shall be deemed to constitute a waiver or election of any of our client's rights, remedies, claims, defenses or factual assertions which may be available to him, any and all of which are hereby expressly reserved, including, without limitation, claims for lost profits, damages, and attorneys' fees.

　　　　　　　　　　　　　　　　Sincerely,

　　　　　　　　　　　　　　　　Alison Finley

cc:　　Mr. Kanye West
　　　　Ms. Donda West
　　　　Mr. Gee Roberson
　　　　Mr. John Monopoly

# Exhibit G

# DAVIS SHAPIRO LEWIT MONTONE & HAYES, LLP

NEW YORK          BEVERLY HILLS          SAN FRANCISCO

AFFILIATED WITH:
BLOOM HERGOTT DIEMER ROSENTHAL & LAVIOLETTE, LLP

March 29, 2005

**Via Fax: 011-44-20-8236-2312**

Mr. Graham Betts
Licensing Manager
Pickwick Group
2003 Centennial Park
Elstree Herts
WD63SN
United Kingdom

RE:    **Kanye West**

Gentlemen:

This firm represents Kanye West.

It has come to our client's attention that you have had discussions with Eric Miller ("Miller") professionally known as "E-Smoove" and Focus Music Group ("Focus") regarding the distribution of certain master recordings embodying the performances of Kanye West (the "Masters"). Further, it is our understanding that you and/or persons working in concert with you may be in possession of the Masters and/or that you are planning to exploit or have exploited the Masters.

Please be advised, neither Mr. West nor any authorized agents or representatives of Mr. West, have granted Miller and/or Focus the right to exploit the Masters. I understand that Mr. Miller may have provided you with a copy of an alleged "agreement" signed by Mr. West purporting to grant the foregoing rights. Please be advised, that the alleged "agreement" is not a valid contract with Mr. West and we possess documentation from Mr. Miller that confirms that fact. Accordingly, you are hereby notified that any exploitation by you (or persons authorized by you) of the Masters, whether commercially, promotionally or otherwise, constitutes an infringement of our client's rights under applicable international, federal and state laws, including without limitation, intentional copyright infringement, breach of our client's publicity rights, as well as, what amounts to tortious interference with our client's actual and prospective business relationships.

In light of the foregoing, demand is hereby made that you immediately cease and desist (and advise all third-parties authorized by you), to cease and desist from any manufacture, sale or distribution of the Masters and that you destroy all such Masters (and provide us with written certification of such destruction) no later than the close of business on Tuesday, April 5, 2005. If you fail to comply with the foregoing, our client shall take all necessary legal actions, including but

not limited to seeking injunctive and other equitable relief to prevent you from the manufacture,
distribution, sale or other exploitation of the Masters.

Nothing contained herein nor omitted here from shall be deemed to constitute
a waiver or election of any of our client's rights, remedies, claims, defenses or factual assertions
which may be available to him, any and all of which are hereby expressly reserved, including,
without limitation, claims for lost profits, damages, and attorneys' fees.

Sincerely,

Alison Finley

cc:    Mr. Kanye West
       Ms. Donda West
       Mr. Gee Roberson
       Mr. John Monopoly

# Exhibit H

# DAVIS SHAPIRO LEWIT MONTONE & HAYES, LLP

**NEW YORK**          **BEVERLY HILLS**          **SAN FRANCISCO**

AFFILIATED WITH:
BLOOM HERGOTT DIEMER ROSENTHAL & LAVIOLETTE, LLP

March 30, 2005

**Via E-Mail**

Mr. Jeff Pringle
John Galt Entertainment, Inc.
2817 West End Ave., #126
Nashville, TN 37203

RE:    **Kanye West**

Dear Jeff:

As you know, this firm represents Kanye West.

It has come to our client's attention that you have had discussions with Eric Miller ("Miller") professionally known as "E-Smoove" and Focus Music Group ("Focus") regarding the distribution of certain master recordings embodying the performances of Kanye West (the "Masters"). Further, it is our understanding that you and/or persons working in concert with you may be in possession of the Masters and/or that you are planning to exploit or have exploited the Masters.

Please be advised, neither Mr. West nor any authorized agents or representatives of Mr. West, have granted Miller and/or Focus the right to exploit the Masters. I understand that Mr. Miller may have provided you with a copy of an alleged "agreement" signed by Mr. West purporting to grant the foregoing rights. Please be advised, that the alleged "agreement" is not a valid contract with Mr. West and we possess documentation from Mr. Miller that confirms that fact. Accordingly, you are hereby notified that any exploitation by you (or persons authorized by you) of the Masters, whether commercially, promotionally or otherwise, constitutes an infringement of our client's rights under applicable international, federal and state laws, including without limitation, intentional copyright infringement, breach of our client's publicity rights, as well as, what amounts to tortious interference with our client's actual and prospective business relationships.

In light of the foregoing, demand is hereby made that you immediately cease and desist (and advise all third-parties authorized by you), to cease and desist from any manufacture, sale or distribution of the Masters and that you destroy all such Masters (and provide us with written certification of such destruction) no later than the close of business on Tuesday, April 5, 2005. If you fail to comply with the foregoing, our client shall take all necessary legal actions, including but not limited to seeking injunctive and other equitable relief to prevent you from the manufacture, distribution, sale or other exploitation of the Masters.

Nothing contained herein nor omitted here from shall be deemed to constitute a waiver or election of any of our client's rights, remedies, claims, defenses or factual assertions which may be available to him, any and all of which are hereby expressly reserved, including, without limitation, claims for lost profits, damages, and attorneys' fees.

Sincerely,

Alison Finley

cc:     Mr. Kanye West
        Ms. Donda West
        Mr. Gee Roberson
        Mr. John Monopoly

# Exhibit I

# PRYOR CASHMAN SHERMAN & FLYNN LLP

NEW YORK   ALBANY   LOS ANGELES

410 PARK AVENUE, NEW YORK, NY 10022-4441   TEL: 212-421-4100   FAX: 212-326-0806

*www.pryorcashman.com*

DIRECT TEL: 212-326-0192
DIRECT FAX: 212-798-6386
phoffman@pryorcashman.com

June 22, 2005

**BY HAND**

Mark A. Levinsohn, Esq.
Epstein, Levinsohn, Bodine, Hurwitz & Weinstein, LLP
1790 Broadway, 10th Floor
New York, NY 10019

Re:   **Kanye West v. Eric 'E Smoove' Miller and Focus Music Group**

Dear Mr. Levinsohn:

We represent Kanye West ("West"). We are writing this letter in order to give your clients, Eric 'E Smoove' Miller ("Miller") and Focus Music Group ("Focus") (collectively referred to herein as "Miller"), one last opportunity to cease and desist from their unlawful and illegal conduct prior to our client's commencing litigation in federal court for, inter alia, copyright infringement, violation of his rights of privacy and publicity, unfair competition and tortious interference with contractual relations.

As you are aware, your clients are in possession of certain master recordings embodying the performances by West (the "Unauthorized Masters") of several songs composed by him, including, but not limited to: (1) 25 To Life; (2) Ho!!!; (3) I Keep MC's Lookin Out; (4) My People's Get Down; (5) Real Nigga Live; (6) Stop Frontin'; (7) There Are None; (8) What Am I To You??; and (9) Are We Goin Far? These recordings were apparently made in or about May 1995.

Although neither West nor any of his authorized agents or representatives ever granted your clients any right to exploit the Masters, we learned on or about February 24, 2005 that your clients approached John Galt Entertainment, Inc. ("Galt") to distribute recordings of the Unauthorized Masters in North America and informed Galt that they already had an agreement in place to distribute the recordings in Europe (apparently with Pickwick Group). When Galt, which was being asked for a downpayment of $450,000, asked your clients whether they had obtained permission from West to exploit the Unauthorized Masters, your clients provided Galt with a bogus contract entitled "Artist Recording Agreement" (containing a forgery of West's signature) which they fraudulently represented that West had entered into with Focus on May 19, 1995.

PRYOR CASHMAN SHERMAN & FLYNN LLP

Mark A. Levinsohn, Esq.
June 22, 2005
Page 2

Fortunately, Galt doubted the claims being made by your client and subsequently sent a copy of the alleged agreement (hereafter the "Fraudulent & Forged Agreement") to West's attorney, Alison Finley ("Finley") and asked if she would confirm your clients' representation that the Fraudulent & Forged Agreement was legitimate.

As it was clear from a review of the Fraudulent & Forged Agreement that West had never signed it, Finley immediately contacted Steve Hulme ("Hulme"), who was purporting to act on behalf of your clients. In his e-mail to Finley dated March 17, 2005, Hulme conceded that your clients had no right to release and distribute the Unauthorized Recordings without first obtaining West's consent to do so. Indeed, it was for that reason that Hulme conveyed Miller's proposal to West to release the Unauthorized Recordings. In that proposal, Miller similarly conceded that he needed West's consent to release the Unauthorized Recordings and offered various amounts of money in order to induce West to give that consent. In his proposal to West, Miller did not even mention the alleged existence of the Fraudulent & Forged Agreement for reasons which became apparent later that day.[1]

Realizing that his fraudulent actions had been discovered and that Finley had seen the Fraudulent & Forged Agreement, Miller on March 17, 2005 sent an e-mail to another of West's representatives, John Monopoly ("Monopoly") and admitted the fraud:

> That contract that Allison has is a non issue, it was just a dummy up we were using to get the distributors to even talk to us. It was never supposed to leave the Broker's hands but one of the distributors must have gotten anxious while we were researching the numbers. (emphasis supplied).

In addition to this admission of a criminal and fraudulent act, e.g., forgery, Miller later in his e-mail conceded that neither he nor Focus ever had a contract with West.

On March 23, 2005, Monopoly informed Miller that West would not consent to the re-lease and distribution of the Unauthorized Masters. Later that morning, Miller contacted West's mother, Donda, and was told once again that West was not interested. Miller indicated that he would nevertheless send Ms. West a proposal, which he did later that day, once again acknowledging the non-existence of any previous valid agreement with West.

As you are aware, on March 24, 2005, Finley sent an e-mail to Miller in which she not only rejected the proposal on behalf of West, but also stated:

---

[1] Even if the Fraudulent & Forged Agreement had been prepared in May 1985 (it was not) and was actually signed by West (as opposed to Miller's illegal forging of West's signature), such agreement would still be invalid. Under Illinois law, West, who did not turn 18 until June 8, 1995, was a minor as of May 19, 1995. 750 Ill. Comp. Stat. §30/3-1 (2005); 325 Ill. Comp. Stat. §45/2. Unless the alleged contract was "approved by the circuit court in the county in which the minor resides or is employed" (which it was not), it is voidable. 820 Ill. Compl Stat. §20/1(a).

PRYOR CASHMAN SHERMAN & FLYNN LLP

Mark A. Levinsohn, Esq.
June 22, 2005
Page 3

As you are aware, neither Mr. West nor any authorized agents or representatives of Mr. West, have granted you the right to exploit the Masters. Accordingly, you are hereby placed on notice that any exploitation by you (or persons authorized by you) of the Masters, whether commercially, promotionally or otherwise, constitutes an infringement of our client's rights under applicable federal and state laws, including without limitation, intentional copyright infringement, breach of our client's publicity rights, fraud, as well as, what amounts to tortious interferences with our client's actual and prospective business relationships.

In light of the foregoing, demand is hereby made that you immediately cease and desist (and advise all third-parties authorized by you), to cease and desist from any manufacture, sale or distribution of the Masters and that you destroy all such Masters (and provide us with written certification of such destruction) no later than the close of business on Monday, April 4, 2005. Additionally you must provide us with a list of all distributors with whom you have contacted to discuss the exploitation of the Masters. If you fail to comply with the foregoing, our client shall take all necessary legal actions, including but not limited to seeking injunctive and other equitable relief to prevent you or any third party from the manufacture, distribution, sale or other exploitation of the Masters.

Based upon the facts set forth above and the absolutely lack of any legal basis to do so, we are somewhat shocked that your clients, through you, are still threatening to release and distribute the Unauthorized Recordings and are demanding money from West in order to stop such release and distribution. As you have been repeatedly informed, West will not bow to such extortion.

We hereby demand that your clients, no later than June 30, 2005, send us a letter confirming in writing that they will not exploit the Unauthorized Masters in any way, shape or form. Their failure to do so will leave West no choice but to immediately commence suit against your clients and all those in active concert with them for, inter alia, willful copyright infringement, violation of his rights of privacy and publicity, unfair competition and tortious interference with the exclusive contractual relations which West has with his recording companies. West shall seek and, based upon the above facts, should obtain the maximum damages available to him, including statutory and punitive damages and attorney's fees. In addition, our client will seek all appropriate declaratory relief and equitable remedies, including the obtaining of an order of seizure and temporary restraining order.

PRYOR CASHMAN SHERMAN & FLYNN LLP

Mark A. Levinsohn, Esq.
June 22, 2005
Page 4


The foregoing is without prejudice to our client's rights and nothing contained herein shall be deeded a waiver of any of such rights, all of which are hereby expressly reserved.

Sincerely yours,

Philip R. Hoffman

PRH:dm
cc:    Mr. Kanye West
       Ms. Donda West
       Mr. Gee Roberson
       Mr. John Monopoly
       Alison Finley, Esq.

# Exhibit J

# EPSTEIN, LEVINSOHN, BODINE, HURWITZ & WEINSTEIN, LLP

ATTORNEYS AT LAW
1790 BROADWAY
NEW YORK, NEW YORK 10019-1412

ROBERT J. EPSTEIN
MARK A. LEVINSOHN
SUSAN H. BODINE
ANDREW P. HURWITZ
JOEL H. WEINSTEIN
JAMES D. ARNAT
ANDREA F. CANNISTRACI
ALISON S. COHEN

TELEPHONE: 212 262 1000
FACSIMILE: 212 262 5022
DIRECT DIAL:
(212) 262-0123
DIRECT E MAIL:
mlevinsohn@entlawfirm.com

BENJAMIN C. FELDMAN
ALAN N. SKIBNA
SAGUIT SAAD
MICHAEL P. OVEEN
DOUGLAS C. BERNHEIM
NATALIE D. STANFORD

July 1, 2005

**BY TELEFAX**

Philip R. Hoffman, Esq.
Pryor Cashman Sherman & Flynn, LLP
410 Park Avenue
New York, NY 10022-4441

        Re:    **Eric Miller/Kanye West**

Dear Mr. Hoffman:

    I am in receipt of your letter of earlier today. Your letter speaks of "subterfuge" and threatens imminent litigation. With due respect, your are misreading the situation. My client is in the process of analyzing the points you raised in your letter of June 22, and, as I informed you, you will receive a detailed response. While my client disagrees with many of the basic positions set forth in your letter, I can inform you that no imminent exploitation of the master recordings at issue is planned. Accordingly, your threat of litigation is precipitate.

    My client's rights, remedies and positions in this matter are reserved.

                                        Sincerely,

                                        Mark A. Levinsohn

/sdb
cc:    Eric Miller

# Exhibit K

# PRYOR CASHMAN SHERMAN & FLYNN LLP

NEW YORK   ALBANY   LOS ANGELES

410 PARK AVENUE, NEW YORK, NY 10022-4441   TEL: 212-421-4100   FAX: 212-326-0806

*www.pryorcashman.com*

DIRECT TEL.: 212-326-0192
DIRECT FAX: 212-798-6356
phoffman@pryorcashman.com

July 15, 2005

**BY FAX**

Mark A. Levinsohn, Esq.
Epstein, Levinsohn, Bodine, Hurwitz & Weinstein, LLP
1790 Broadway, 10th Floor
New York, NY 10019

Re: **Kanye West v. Eric 'E Smoove' Miller and Focus Music Group**

Dear Mr. Levinsohn:

In your letters to me dated June 30 and July 1, 2005, you represented that you and your client were "in the process of preparing a detailed response to the points" raised in my June 22, 2005 letter to you and that you expected to provide such detailed response to me "shortly." Nevertheless, over three weeks have passed without that "detailed" response being provided.

Although you indicated in your July 1, 2005 letter that "no imminent exploitation of the master recordings at issue is planned," that representation is no longer sufficient considering that valuable time has passed and our client's release of a new recording is scheduled to take place in the very near future.

In short, this matter must be put to rest with finality. We therefore reiterate our demand that your clients send us a letter by July 22, 2005 confirming in writing that they will not exploit the Unauthorized Masters in any way, shape or form. I have been instructed to tell you that, barring timely receipt of such written confirmation, litigation will be swiftly commenced.

The foregoing is without prejudice to our client's rights herein and nothing contained herein shall be deeded a waiver of any of such rights, all of which are hereby expressly reserved.

Sincerely yours,

Philip R. Hoffman

PRYOR CASHMAN SHERMAN & FLYNN LLP

Mark A. Levinsohn, Esq.
July 15, 2005
Page 2


PRH:dm
cc:   Mr. Kanye West
      Ms. Donda West
      Mr. Gee Roberson
      Mr. John Monopoly
      Alison Finley, Esq.

# Exhibit L

Message

# Hoffman, Philip R.

| | |
|---|---|
| **From:** | Hoffman, Philip R. |
| **Sent:** | Wednesday, July 27, 2005 2:36 PM |
| **To:** | 'Mark Levinsohn' |
| **Cc:** | Eric Miller (E-mail) |
| **Subject:** | RE: Eric Miller / Kanye West |

Dear Mr. Levinsohn,

I look forward to your response.

The foregoing is without prejudice to our client's rights herein.

Philip R. Hoffman


Philip R. Hoffman
Pryor Cashman Sherman & Flynn LLP
410 Park Avenue
New York, NY 10022
Phone: (212) 326-0192
Fax: (212) 798-6386

-----Original Message-----
**From:** Mark Levinsohn [mailto:MLevinsohn@entlawfirm.com]
**Sent:** Wednesday, July 27, 2005 1:45 PM
**To:** Hoffman, Philip R.
**Cc:** Eric Miller (E-mail)
**Subject:** Eric Miller / Kanye West

Dear Mr. Hoffman,

I refer to your letter of July 15th.

I am out of my office, but will respond tomorrow. Mr. Miller has again assured me that he is taking no steps to release or otherwise exploit the master recordings. He remains optimistic that litigation can be avoided.

Sincerely,

Mark Levinsohn


**MARK LEVINSOHN** | Epstein Levinsohn Bodine Hurwitz & Weinstein, LLP | 1790 Broadway, 10th Floor, New York, New York 10019 | phone: (212) 262-0123 | fax: (212) 262-5022 | mlevinsohn@entlawfirm.com | www.entlawfirm.com

This email, including any attachments, is confidential and may be legally privileged. If you have received it in error please advise the sender immediately

7/27/2005

Message

by return email and then delete it from your system. The unauthorized use, distribution, copying or alteration of this email is strictly forbidden. If you need assistance please contact (212) 262-1000.

# Exhibit M

# EPSTEIN, LEVINSOHN, BODINE, HURWITZ & WEINSTEIN, LLP

ATTORNEYS AT LAW
1790 BROADWAY
NEW YORK, NEW YORK 10019-1412

TELEPHONE: 212 262 1000
FACSIMILE: 212 262 5022

DIRECT DIAL:
(212) 262-0123

DIRECT E MAIL:
mlevinsohn@cntlawfirm.com

ROBERT J. EPSTEIN
MARK A. LEVINSOHN
SUSAN H. BODINE
ANDREW P. HURWITZ
JOEL H. WEINSTEIN
JAMES D. ARNAY
ANDREA F. CANNISTRACI
ALISON S. COHEN

BENJAMIN C. FELDMAN
ALAN N. SKIENA
SAQUIT SAAD
MICHAEL P. OVERN
DOUGLAS C. BERNHEIM
NATALIE D. STANFORD

July 29, 2005

BY TELEFAX

Philip R. Hoffman, Esq.
Pryor Cashman Sherman & Flynn, LLP
410 Park Avenue
New York, NY 10022-4441

Re: Eric Miller "E Smoove" Miller and Focus Music Group -w- Kanye West

Dear Mr. Hoffman:

I refer to your letter of June 22, 2005 and our subsequent exchange of correspondence.

Simply put, my client's position is that he owns all right, title and interest to the master recordings entitled (1) 25 to Life; (2) Ho!!!; (3) I Keep MC's Lookin Out; (4) My People's Get Down; (5) Real Nigga Live; (6) Stop Frontin'; (7) There Are None; (8) What Am I To You??; and (9) Are We Goin Far? (individually and collectively, the "Recordings"). He asserts that the Recordings were made pursuant to an express understanding between Kanye West and Mr. Miller's production company/label, Focus Music Group. Indeed, Mr. West has acknowledged on numerous occasions that he was a Focus Recording Artist. In fact, as recently as June 8, 2005, Mr. West confirmed this to Cherisse Miller in front of several witnesses at Sony Recording Studios.

Contrary to the allegations contained in your letter of June 22nd, Mr. Miller does not wish to cause any harm to Mr. West. Although Mr. Miller believes that he does not require Mr. West's permission to distribute the Recordings, he maintains a high level of respect for Mr. West and his accomplishments, and has asked for Mr. West's blessing to distribute them. Mr. Miller believes that he had a strong friendship with Mr. West when they worked together in 1995-1996, at a time when Mr. West was a struggling artist and accepted financial support, mentorship and other resources from Mr. Miller. Out of respect for that relationship, Mr. Miller approached Alison Finley and suggested sharing profits with Mr. West, and even packaging the Recordings on a multi-artist compilation

Philip Hoffman, Esq.
July 29, 2005
Page 2

in a way that clearly would not bring any consumer confusion to any of Mr. West's
upcoming projects. This is far from the extortion and tortious interference that you have
alleged.

Admittedly, Mr. Miller does not understand Mr. West's position of not wanting to
release the old material on the basis that "he has moved on creatively," but he does
respect it. He personally believes that distributing the Recordings would be a perfect way
for Mr. West to stay connected to his "underground" fan base, while showcasing his
growth and maturity as an artist. Unfortunately, Mr. West and his advisors do not see it
this way. Mr. Miller is a Grammy-nominated producer and an artist as well, so he once
again respects Mr. West's feelings. However, he does not believe that Mr. West's current
position should diminish any of Mr. Miller's rights or the value in the Recordings. With
that said, my client would like to propose a third party mediation between Mr. West and
himself to meet and structure a mutually productive agreement just as they did when the
material was created in 1995-1996.

I look forward to hearing from you. In the meantime, Mr. Miller's rights and
remedies are reserved.

Sincerely,

Mark A. Levinsohn /sdb

Mark A. Levinsohn
Dictated but not read

/sdb

cc:    Eric Miller

# Exhibit N

# PRYOR CASHMAN SHERMAN & FLYNN LLP

NEW YORK  ALBANY  LOS ANGELES

410 PARK AVENUE, NEW YORK, NY 10022-4441  TEL: 212-421-4100  FAX: 212-326-0806

*www.pryorcashman.com*

DIRECT TEL : 212-326-0192
DIRECT FAX: 212-798-6386
phoffman@pryorcashman.com

August 3, 2005

**BY FAX**

Mark A. Levinsohn, Esq.
Epstein, Levinsohn, Bodine, Hurwitz & Weinstein, LLP
1790 Broadway, 10th Floor
New York, NY 10019

Re:  **Kanye West v. Eric 'E Smoove' Miller and Focus Music Group**

Dear Mr. Levinsohn:

I have your letter dated July 29, 2005. Although it is clear that this matter is going to be litigated, I am going to take this last opportunity to respond to some of the outrageous statements contained in your letter with the hope that you will be able to convince your clients to do the right thing and agree that they will not exploit the Unauthorized Master Recordings in any way.

1.     You claim that your "client's position is that he owns all right, title and interest to the master recordings ..." For all of the reasons stated in our previous correspondence, that is simply not the case. As for your statement that Eric Miller ("Miller") "asserts that the Recordings were made pursuant to an express understanding between Kanye West and Mr. Miller's production company/label, Focus Music Group," that assertion is an outright falsehood. If such an agreement had actually existed, there would have been no need for Miller to create a "dummy up" contract and forge our client's name to it, all for the purpose of defrauding would-be distributors of the recordings.

2.     Even if the parties had an "express understanding" (and they did not), our client was a minor at the time it is alleged to have taken place. 750 Ill. Comp. Stat. §30/3-1 (2005); 325 Ill. Comp. Stat. §45/2. Unless the alleged "express understanding" was "approved by the circuit court in the county in which the minor resides or is employed" (which it was not), it is voidable. 820 Ill. Compl Stat. §20/1(a). You and your client have already been put on notice by Kanye West ("West") and his representatives that the alleged agreement is of no force and effect.

3.     Your claim that West "has acknowledged on numerous occasion that he was a Focus Recording Artist" is utterly ridiculous and irrelevant. If you have a valid contract relating

PRYOR CASHMAN SHERMAN & FLYNN LLP

Mark A. Levinsohn, Esq.
August 3, 2005
Page 2

to these Unauthorized Master Recordings, produce it. If your position is so weak that you have
to rely on such statements, that should tell you that it is time to advise your client to agree not to
exploit the Unauthorized Master Recordings in any way.

4.    Your statement that "Mr. Miller does not wish to cause any harm to Mr. West" is
utterly belied by the facts. I also take it that you are not aware that when West was recently in
Chicago and was going to the airport, his security noticed that Miller was following West in his
car for 45 minutes and had to take measures to put a stop to it.

5.    You state in your letter that "[a]lthough Mr. Miller believes that he does not re-
quire Mr. West's permission to distribute the Recordings, he maintains a high level of respect for
Mr. West and his accomplishments, and has asked for Mr. West's blessing to distribute them."
As a matter of law, that statement is wrong. Miller does require West's permission to distribute
the recordings and that permission is denied.

6.    Your statement that Miller approached Alison "out of respect" for Miller's relat-
ionship with West is shamefully disingenuous and untrue. Miller went to Ms. Finley because the
distributors he was trying to defraud contacted Ms. Finley and alerted her to the fact. Miller
likely contacted Ms. Finley because he knew that if he did not do so, he would face serious legal
consequences.

7.    Your claim that Miller does not understand West's position is unbelievable.
Considering that Miller, according to your letter, "is a Grammy-nominated producer and an artist
as well," one would think that he would know something about exclusive recording agreements.
As we are sure that both you and Miller are aware, West has an exclusive recording agreement
with  Roc A Fella Records. Even if West wanted to enter into a deal with Miller (and he does
not want to do so), his contract expressly prohibits him from doing so. Indeed, Roc A Fella Rec-
ords will have valid claims against Miller for tortious interference should he attempt to distribute
the Unauthorized Master Recordings.

Based upon all of the above, your proposal for a third party mediation is rejected. We
demand, for the last time, that your clients immediately agree in writing that they will not exploit
the Unauthorized Masters in any way, shape or form, and that you provide such writing to us no
later than Monday, August 8, 2005. Barring such agreement, please immediately: (a) advise us
whether you will accept service of process on behalf of Miller and Focus Music Group; and (b)
confirm that your clients are not exploiting the Unauthorized Masters in any way, shape or form
and will not attempt to do so unless and until there is a final judicial termination in their favor.

PRYOR CASHMAN SHERMAN & FLYNN LLP

Mark A. Levinsohn, Esq.
August 3, 2005
Page 3

The foregoing is without prejudice to our client's rights herein and nothing contained herein shall be deeded a waiver of any of such rights, all of which are hereby expressly reserved.

Sincerely yours,

Philip R. Hoffman

PRH:dm
cc:   Mr. Kanye West
       Ms. Donda West
       Mr. Gee Roberson
       Mr. John Monopoly
       Alison Finley, Esq.